UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BUCHER AND CHRISTIAN CONSULTING, INC. doing business as BCFORWARD, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:15-cv-00010-TWP-MJD |
| vs. | ) ) | |
| NOVITEX ENTERPRISE SOLUTIONS, INC. formerly known as PITNEY BOWES MANAGEMENT SERVICES, INC., | ) ) ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS**

This matter comes before the Court on Defendant's Motion to Dismiss. [Dkt. 12.] For the

reasons set forth below, the Magistrate Judge recommends that the Court **GRANT** Defendant's

motion.

## I.     Background[1]

Novitex Enterprise Solutions, Inc. ("Defendant" or "Novitex") is a public corporation

that provides document management, copying, and mailing services. [Dkt. 1-1 ¶ 2 (Pl.'s

Compl.).] In 2006, Novitex learned that the State of Indiana ("the State") was preparing to solicit

such services through a "Request for Proposal" later designated "RFP 7-61." [*See id.* ¶¶ 14-17.]

Novitex began to prepare a bid for RFP 7-61, and, as part of that process, Novitex sought

to comply with the Indiana Department of Administration's Participation Policy for Construction

Projects ("the IDOA Policy"). [*Id.* ¶¶ 4-5; *see also id.* at 15-22 (Pl.'s Ex. 1).] The IDOA Policy

requires that bids for the State's contracts incorporate certain levels of participation by certified

---

[1] The background as set forth below is drawn from the allegations in Plaintiff's complaint, which the Court accepts as true for the purposes of ruling on Defendant's motion to dismiss. *See, e.g., CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 487 (7th Cir. 2014).

Minority and Women Business Enterprises ("M/WBEs"). [*Id.* ¶¶ 4-6.] Thus, when a general contractor such as Novitex submits a bid, the general contractor must include a "Participation Plan" listing the M/WBE subcontractors that plan to participate in the contract. [*Id.* ¶ 8.] The general contractor must also furnish to the State "Letters of Commitment" from subcontractors stating that the subcontractors will participate in the project if the State accepts the general contractor's bid. [*Id.* ¶ 9.]

Bucher and Christian Consulting Inc., d/b/a BC*forward* ("BC*forward*" or "Plaintiff"), is an Indianapolis consulting firm that is a certified M/WBE. [*Id.* ¶¶ 12-13.] In early 2007, BC*forward* communicated with Novitex, and the parties agreed that Novitex's bid for RFP 7-61 would include a plan for BC*forward* to provide $425,000 of consulting services. [*Id.* ¶ 16-17.] In January 2007, BC*forward* submitted to Novitex a Letter of Commitment confirming that it would provide the consulting services in the event that the State accepted Novitex's bid. [*Id.* ¶ 18; *see also id.* at 23 (Pl.'s Ex. 2).] Novitex submitted this letter to the State and included BC*forward* in its Participation Plan. [*Id.* ¶ 19.]

On June 27, 2007, the State accepted Novitex's bid for RFP 7-61, [*id.* ¶ 20], and the State and Novitex signed "Professional Services Contract—EDS No. C39-8-PITNEYBOWES" ("the PB Contract."). Section 28 of the PB Contract provided that Novitex would comply with the terms of the previously submitted Participation Plan and included BC*forward* among a list of M/WBEs that had been selected for participation in the fulfillment of the PB Contract. [*Id.* ¶ 24; *see also id.* at 37 (Pl.'s Ex. 3—PB Contract).]

The PB Contract provided that Novitex would provide services to the State for a period of five years beginning on the contract's execution date of June 27, 2007, with an optional renewal for an additional two years. [*Id.* at 25 (PB Contract Section 3).] It also required Novitex

to obtain the approval of the IDOA's Minority and Women's Business Enterprises Division ("MWBED") before making any changes to its Participation Plan. [*Id.* at 37 (PB Contract Section 28).]

After execution of the PB Contract, a subcontract between Novitex and BC*forward* never materialized. [*Id.* ¶ 26.] Then, on December 20, 2012, the State and Novitex amended Section 28 of the PB Contract. [*Id.* at 55 (Pl.'s Ex. 4—Amendment 17 to PB Contract).] This amendment removed the explicit reference to BC*forward*. [*Id.*] It stated that although Novitex would "comply with the provisions of [its] participation plan" insofar as it obtained a certain overall percentage of services from M/WBE's, the "[a]mounts for each [M/WBE subcontractor] will vary through the term of the contract." [*Id.*]

On December 5, 2014, BC*forward* sued Novitex in Marion County Superior Court. [*Id.* at 6.] Count I of BC*forward*'s complaint alleged breach of contract on the grounds that Novitex had deprived BC*forward* of its rights as an alleged third-party beneficiary under the terms of the PB Contract. [*Id.* ¶¶ 34-42.] Counts II and III alleged unjust enrichment and intentional misrepresentation on the grounds that, despite its representations to BC*forward* and the State, Novitex had never actually intended to utilize BC*forward*'s services. [*Id.* ¶¶ 43-59.] Novitex removed the case to this court, [Dkt. 1], and Novitex then filed the currently pending motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. 12.]

## II. Discussion

To survive a Rule 12(b)(6) motion, a "complaint must 'state a claim to relief that is plausible on its face.'" *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must thus contain "either direct or inferential allegations respecting all the material elements necessary to sustain recovery" under the relevant legal theory. *See Twombly*, 550 U.S. at 562. Pleading only "labels and conclusions" or only "a formulaic recitation of the elements of a cause of action" will not suffice, nor will pleading facts that are "merely consistent" with a defendant's liability. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557)).

In applying these principles, a court construes the complaint in the light most favorable to the plaintiff. *Yeftich*, 722 F.3d 911, 915. The court accepts all well-pleaded facts as true and draws all reasonable inference in favor of the plaintiff, but the court "need not accept as true statements of law or unsupported conclusory factual allegations." *Id.* The court may also consider any exhibits attached to a plaintiff's complaint. *See, e.g.*, *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). If these exhibits contradict the allegations in the complaint, then the exhibits are controlling. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). In this case, Plaintiff included with its complaint 1) the IDOA Policy [Dkt. 1-1 at 15 (Ex. 1)]; 2) Plaintiff's Letter of Commitment [*id.* at 23 (Ex. 2)]; 3) the PB Contract between Defendant and the State [*id.* at 24 (Ex. 3)]; and 4) Amendment 17 to the PB Contract. [*Id.* at 55 (Ex. 4).] The Court thus considers these exhibits as necessary in ruling on Defendant's motion.

### A.  Statute of Limitations

Defendant first contends the Court must dismiss Plaintiff's unjust enrichment and intentional misrepresentation claims because both of these causes of action are barred by

Indiana's[2] statute of limitations. [Dkt. 13 at 6.] Dismissing a complaint on this basis "is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Such a dismissal, however, is appropriate "when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Id.* at 674-75.

In this case, Indiana imposes a six-year statute of limitations on Plaintiff's unjust enrichment and intentional misrepresentation claims, *see, e.g.*, *City of E. Chicago, Indiana v. E. Chicago Second Century, Inc.*, 908 N.E.2d 611, 619 (Ind. 2009) (citing Ind. Code § 34–11–2–7) (unjust enrichment); *In re Julie R. Waterfield Irrevocable Trust Agreement Dated Oct. 21, 1997*, 960 N.E.2d 800, 808 n.3 (Ind. Ct. App. 2011) (citing Ind. Code § 34–11–2–7) (intentional misrepresentation[3]), and Plaintiff filed its complaint on December 5, 2014. [Dkt. 1-1 at 6.] Dismissal is thus appropriate if Plaintiff has "[pled] himself out of court by alleging facts sufficient to establish" that the statute of limitations began to run prior to December 5, 2008 and was not thereafter tolled.

In Indiana, "a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury." *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008). The plaintiff need not know the "full extent of the damage;" rather, the statute begins to run when "some ascertainable damage has occurred." *Id.* at 758-59 (quoting *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996)).

---

[2] Where, as here, a federal court sits in diversity, the court applies the statute of limitations of the forum state. *See, e.g.*, *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 528 (7th Cir. 1999) (quoting *Evans v. Lederle Labs.*, 167 F.3d 1106, 1111–12 (7th Cir. 1999)) ("Statutes of limitations are generally considered part of the forum state's substantive law which federal courts must apply when sitting in diversity.").

[3] The *Waterfield* decision refers to "fraud" rather than "intentional misrepresentation," but the different labels refer to the same cause of action. *See, e.g.*, *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 888-89 (Ind. Ct. App. 2007) (treating claim for "intentional misrepresentation" as one for "actual fraud"); *see also Mehling v. Dubois Cnty. Farm Bureau Co-op. Ass'n, Inc.*, 601 N.E.2d 5, 8 (Ind. Ct. App. 1992) ("[Appellant's] claims for intentional and negligent misrepresentation, or fraud, must fail.").

## 1. Unjust Enrichment

"To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Kohl's Indiana, L.P. v. Owens*, 979 N.E.2d 159, 167 (Ind. Ct. App. 2012). This requires three elements: "(1) a benefit conferred upon another at the express or implied consent of such other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment." *Id.* at 167-68.

Here, Plaintiff's unjust enrichment claim alleges that Defendant "retained BC*forward*, a locally-owned MBE subcontractor, during the bidding process" for RFP 7-61, but that Defendant actually intended to and later did "replace[] BC*forward* with a national subcontractor with whom Novitex has an ongoing relationship or with in-house staff." [Dkt. 1-1 ¶¶ 45-46.] This allegedly "required BC*forward* to expend significant resources in the procurement and bidding process and unjustly conferred a benefit on Novitex." [*Id.* ¶ 47.] Plaintiff's alleged injury thus consists of the resources that it expended in communicating with Novitex prior to the State's acceptance of Novitex's bid.

These resources, however, were expended well before December 5, 2008. According to Plaintiff's own allegations, Plaintiff and Defendant discussed Plaintiff's potential role in Defendant's bid "in early 2007." [*Id.* ¶ 17.] These discussions resulted in Plaintiff sending its Letter of Commitment to Defendant "[o]n or about January 31, 2007," and Defendant won its bid for RFP 7-61 "[o]n June 27, 2007." [*Id.* ¶¶ 18, 20.] At the latest, then, Plaintiff incurred the entirety of its alleged injury by June 27, 2007. This was over one year and five months before the relevant date of December 5, 2008, and so the issue is whether Plaintiff "[knew of] or in exercise of ordinary diligence should have known of the injury" at any point during this one year and

five-month timeframe. *Pflanz*, 888 N.E.2d at 759. If so, then Indiana's statute of limitations bars Plaintiff's unjust enrichment claim.

Here, it is obvious that Plaintiff knew or should have known of its injury well before December 5, 2008. The PB Contract specifies that it was effective for five years after its June 27, 2007 execution. [Dkt. 1-1 at 25, 54 (Pl.'s Ex. 3).] Plaintiff's Letter of Commitment then stated that, upon execution of that contract, Plaintiff would "participate in the contract [by] providing Information Technology consultant(s) for data conversion purposes **starting at the date of contract award** and lasting 5 years in a dollar amount of **$85,000 annually**." [*Id.* at 23 (Pl.'s Ex. 2) (emphasis added).]

Plaintiff's own submissions thus indicate that, from June 27, 2007 to June 27, 2008, Plaintiff allegedly should have been paid $85,000 in exchange for its provision of consulting services. Further, from June 27, 2008 to December 5, 2008, Plaintiff allegedly should have been paid the pro-rated portion of $85,000 for approximately five months of services. It strains credulity to imagine that a business would not know and—in the exercise of ordinary diligence— **could not** know that, for almost one a half years, and despite express plans to the contrary, it was not providing any services and was not receiving any payment. Plaintiff thus knew or should have known of its injury well before December 5, 2008, and the statute of limitations thus began to run more than six years before Plaintiff filed its complaint. As such, Plaintiff's unjust enrichment claim is time-barred.

Plaintiff opposes this result on the grounds that it could not have known of its injury until the June 2012 end of the five-year term of the PB Contract. [Dkt. 21 at 7.] Only then, the argument goes, would Plaintiff have been aware that Defendant failed to utilize Plaintiff in Defendant's performance of the PB Contract. [*Id.*]

Plaintiff's argument, however, ignores the distinction between knowing that an injury has occurred and knowing the full extent of that injury. *See Pflanz*, 888 N.E.2d at 758-59. The Court acknowledges that, until June 2012, Plaintiff would not have realized that Defendant would **never** use Plaintiff's services at **any** point during the five-year term of the contract. Thus, until June 2012, Plaintiff would not have realized that the **entirety** of its efforts to win a subcontract with Defendant had been wasted. As noted above, however, a cause of action accrues even when the "full extent of the damage" is unknown. *Pflanz*, 888 N.E.2d at 759; *see also id.* (statute begins to run as long as "some ascertainable damage has occurred").

In this case, Plaintiff knew or should have known by June 27, 2008 that it had allegedly been deprived of at least $85,000 in payments it expected to receive from Defendant. Plaintiff thus would have known that at least a portion of the "significant resources" it expended "in the procurement and bidding process," [Dkt. 1-1 ¶ 47], had been wasted, such that it knew or should have known **at that time** that it had suffered "some ascertainable damage." Hence, even if Plaintiff did not realize the full extent of the damage until June 2012, the statute of limitations had long-since begun to run, with the ultimate result that Plaintiff's claim was time-barred by the time of the December 5, 2014 filing of Plaintiff's complaint. The Magistrate Judge accordingly recommends that the Court dismiss Plaintiff's unjust enrichment complaint with prejudice.[4]

## 2. Fraud or Intentional Misrepresentation

Plaintiff's fraud or intentional misrepresentation claim is premised on the allegation that Defendant falsely represented that "BC*forward* would be designated to perform certain services

---

[4] Dismissal with prejudice is appropriate when granting leave to amend would be futile. *See, e.g., Garcia v. City of Chi., Ill.*, 24 F .3d 966, 970 (7th Cir.1994) ("A district court does not abuse its discretion in denying leave to amend if the proposed repleading would be futile[.]"). Here, the dates associated with the Letter of Commitment (Ex. 2) and the PB Contract (Ex. 3) establish that Plaintiff's claim is barred by the statute of limitations. Because these exhibits take precedence over any allegations in the complaint, *N. Indiana Gun & Outdoor Shows*, 163 F.3d at 454, Plaintiff cannot save its claim simply by re-pleading new facts, and dismissal with prejudice is therefore appropriate.

and be compensated in accordance with the terms and conditions of the PB Contract and Letter of Commitment." [Dkt. 1-1 ¶ 51.] "In reliance on [these] representations," Plaintiff allegedly "took actions" and suffered damages in "participat[ing] in the bidding and procurement process." [*Id.* ¶¶ 57-59.]

In its response to Defendant's motion to dismiss, Plaintiff acknowledged that representations about future conduct (such as whether BC*forward* "would be designated" to perform services) cannot, as a matter of Indiana law, support a claim for actual fraud. [Dkt. 21 at 1 n.1.] Plaintiff thus agreed "to dismiss its intentional misrepresentation claim without prejudice . . . and replead such cause of action as one for constructive fraud," on the grounds that representations about future conduct **can** support a claim for **constructive** fraud. [*Id.* (citing *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998)).] Such a claim carries the same six-year statute of limitations as a claim for actual fraud or intentional misrepresentation. *Wells*, 691 N.E.2d at 1250 ("The six-year statute of limitations for actions seeking relief against frauds applies to constructive, as well as actual, frauds."). Thus, regardless of how Plaintiff styles its fraud claim, the relevant issue is whether Plaintiff knew or should have known of its cause of action before December 5, 2008.

Here, the analysis is similar to Plaintiff's unjust enrichment claim. The only damages that Plaintiff has alleged in its fraud claim consist of the resources that Plaintiff purportedly wasted in bidding for the subcontract. [Dkt. 1-1 ¶¶ 57-59.] And, as described above, Plaintiff knew or should have known that a substantial portion of those resources were wasted by June 27, 2008. Again, Plaintiff may not have realized the full extent of that alleged waste until June 27, 2012, but knowing the full extent of the injury is irrelevant to the statute of limitations inquiry. *See Pflanz*, 888 N.E.2d at 759. As a result, Plaintiff's cause of action accrued well before December

5, 2008, and Plaintiff's December 5, 2014 complaint was therefore untimely. The Magistrate Judge accordingly recommends that Plaintiff's intentional misrepresentation claim be dismissed with prejudice. Further, to the extent Plaintiff seeks leave to re-plead this claim as a constructive fraud claim, Plaintiff's request should be denied.[5]

### B. Merits of Plaintiff's Claims

The Court now turns to the merits of Plaintiff's claims. As described more fully below, Plaintiff's unjust enrichment and fraud claims—in addition to being time-barred—lack factual support regarding at least one element of each claim. As a result, the Magistrate Judge again recommends that these claims be dismissed. Plaintiff's final claim—breach of contract—is also deficient and should likewise be dismissed.

### A. Unjust Enrichment

To prevail on its unjust enrichment claim, Plaintiff must establish: (1) that it conferred a benefit upon Defendant at Defendant's express or implied consent; (2) that allowing Defendant to retain the benefit without restitution would be unjust; and (3) that Plaintiff expected payment. *Kohl's*, 979 N.E.2d at 167-68.

In the current case, the only benefit that Plaintiff allegedly conferred on Defendant consisted of the resources that Plaintiff spent bidding on the subcontract. [Dkt. 1-1 ¶ 47 ("[Plaintiff] expend[ed] significant resources in the procurement and bidding process and unjustly conferred a benefit on Novitex."); *see also* Dkt. 21 at 21 ("BC*forward* invested time and resources in the bidding process based on [Novitex's] representations, which conferred a

---

[5] Plaintiff briefly argues that it should be allowed to conduct discovery before any determination about the timeliness of its complaint, but "[w]hen a cause of action accrues is generally a question of law for the courts to determine." *Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005). Further, Indiana's "discovery rule" requires an objective analysis, such that factual inquiries regarding Plaintiff's mental state are unnecessary. *See, e.g.*, *Martin Oil Mktg. Ltd. v. Katzioris*, 908 N.E.2d 1183, 1188 (Ind. Ct. App. 2009) ("The foregoing authority reflects that we apply an objective standard to the plaintiff's actions, not a subjective one."). The Court thus need not wait for Plaintiff to conduct discovery before concluding that its claims are time-barred.

measurable benefit on Novitex.").] Plaintiff, however, does not allege any facts supporting a reasonable inference that it "expected payment" for this expenditure of resources. Plaintiff naturally would have expected payment if a subcontract **had** materialized or if Plaintiff **had** provided the anticipated consulting services, but Plaintiff specifically states that no subcontract materialized, [Dkt. 1-1 ¶ 26], and Plaintiff never alleges that it actually provided any of the consulting services. [*See* Dkt. 1-1.] As a result, Plaintiff has failed to support the last element of its unjust enrichment claim, and its pleading is deficient. *See Twombly*, 550 U.S. at 562 (emphasis added) (requiring "allegations respecting **all** the material elements").

Plaintiff then argues that expectation of payment is a subjective inquiry, such that deciding this issue at this stage of litigation is inappropriate. [Dkt. 21 at 20.] At the pleading stage, however, the Court accepts only "reasonable" inferences and allows claims to proceed only if they are "plausible." *Iqbal*, 556 U.S. at 678. Here, it is simply not reasonable or plausible for Plaintiff to argue that it expected to be paid merely for submitting a sub-bid to Defendant. Perhaps Plaintiff would have a claim if it had actually furnished the consulting services that it anticipated providing, but Plaintiff's complaint does not recite such a claim, [*see* Dkt. 1-1], and it seems Plaintiff never actually provided such services. [*See* Dkt. 30 ("BC*forward* never provided IT or data conversion services of any kind to Novitex at any time.").] Plaintiff's complaint thus entirely fails to support one of the essential elements of its unjust enrichment claim, and the Magistrate Judge accordingly recommends that this count be dismissed, even if it were not time-barred.

### B. Constructive Fraud

As noted above, Plaintiff seeks to re-plead its intentional misrepresentation claim as a constructive fraud claim. "The elements of constructive fraud are: 1) a duty existing by virtue of

the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Wells*, 691 N.E.2d at 1250-51.

The "duty" supporting a constructive fraud claim must arise from a "fiduciary" or otherwise "confidential" relationship. *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000). In this case, the only potential relationship between Plaintiff and Defendant is that of general contractor and subcontractor, but "parties cannot rely on a contractual relationship to create a duty. Contractual agreements do not give rise to a fiduciary relationship creating a duty." *Id.*; *see also Allison v. Union Hosp.*, Inc., 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) ("This court has held that parties may not rely on a contractual relationship to create a duty that, if breached, would form the basis of a constructive fraud claim.").[6]

Indiana thus does not recognize the sort of constructive fraud claim that Plaintiff seeks to assert, and any attempt to plead such a claim fails as a matter of law. *See Allison*, 883 N.E.2d at 123 (footnote omitted) ("Inasmuch as the only possible basis for Union's duty to the appellants is the Contract, we can only conclude that the appellants have failed, as a matter of law, to establish that they are entitled to relief on their constructive fraud claim."). Hence, even if Plaintiff's claim were not time-barred, the Magistrate Judge recommends that the Court **GRANT** Defendant's motion to dismiss Plaintiff's intentional misrepresentation claim and **DENY** any request to re-plead this claim as one for constructive fraud.

---

[6] Notably, BC*forward* itself alleges that no subcontract ever materialized. [Dkt. ¶ 26.] The parties' relationship in this case is thus even more tenuous than the contractual relationships found insufficient to support a constructive fraud claim in cases such *Morgan Asset Holding* and *Allison*, such that Plaintiff's constructive fraud claim in this case is that much more implausible.

## C. Breach of Contract

Plaintiff alleges that it was a third-party beneficiary to the PB Contract that existed between the State and Novitex, [Dkt. 1-1 ¶¶ 35, 37], and that Novitex subsequently breached the PB Contract in a way that caused damages to Plaintiff. [*Id.* ¶¶ 41-42.] To properly plead its status as a third-party beneficiary, Plaintiff's complaint must contain factual matter that establishes:

> (1) A clear intent by the actual parties to the contract to benefit the third party;
> (2) A duty imposed on one of the contracting parties in favor of the third party; and
> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citing *NN Investors Life Ins. Co. v. Crossley*, 580 N.E.2d 307, 309 (Ind. Ct. App. 1991)). As explained below, Plaintiff has failed to properly plead the first and second elements, such that its breach of contract claim should be dismissed.

### 1. Intent to Benefit the Third Party

"[T]he intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Luhnow*, 760 N.E.2d at 628. "It is not enough that performance of the contract would be of benefit to the third party." *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (quoting *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996)). Rather, it must appear that "it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed." *Id.* This intent "must affirmatively appear from the language of the instrument when properly interpreted and construed." *Id.*

In this case, Plaintiff stakes its third-party beneficiary claim on Section 28 of the PB Contract. [Dkt. 1-1 ¶ 28.] This section provides: "The Contractor [Novitex] agrees to comply fully with the provisions of the Contractor's MBE/WBE participation plan." [*Id.* at 37.] This section then lists BC*forward* and five other companies from Defendant's Participation Plan, and it indicates that BC*forward* planned to annually provide services worth $85,000. [*Id.*] The remainder of Section 28 then states:

> The Contractor must obtain the approval of [the MWBED] before changing any MBE/WBE participation plan submitted in connection with this Contract. If the Contractor does not meet the proposed percentages [for MBE/WBE participation] in its RFP response, based on the sole discretion of the Contractor, the Contractor could be subject to payments being withheld, adjustments to payments due, and/or suspension or termination of the contract in whole or part.

[*Id.*]

Plaintiff focuses on the section's specific reference to BC*forward* in the list of participating M/WBEs. [Dkt. 21 at 9.] It notes that Indiana courts have previously found third-party beneficiary status where the contract at issue included a specific reference to the third party, [*id.* (citing *St. Paul Fire & Marine Ins. Co. v. Pearson Const. Co.*, 547 N.E.2d 853, 856-57 (Ind. Ct. App. 1989))], and it concludes that the reference to BC*forward* in this case similarly confers third-party beneficiary status. [*Id.*]

Plaintiff's argument places too much weight on the identification of BC*forward*. As noted above, this identification is relevant to the third-party beneficiary analysis, but such identification is only "evidence" of intent that "may" establish third-party beneficiary status. *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001). Hence, Plaintiff may argue that the identification of BC*forward* as an MBE participant is "alone sufficient for purposes of defeating Defendant's Motion," [Dkt. 21 at 14], but this argument goes beyond that which Indiana law will support.

In addition, the case Plaintiff cites in support of its argument is distinguishable. In *St. Paul*, the contract at issue "referred to [the third party] by name," but the contract also designated the third party as the party "for whom the work [was] being done." *St. Paul Fire & Marine Ins. Co. v. Pearson Const. Co.*, 547 N.E.2d 853, 857 (Ind. Ct. App. 1989). Here, in contrast, the work specified in the PB Contract was clearly performed for the **State**, rather than for **BC*forward***, such that any alleged intent to benefit the third-party in this case is much less clear.

Next, it is notable that Section 28 does not impose penalties on the Contractor if it fails to use a specific MBE/WBE. Rather, Section 28 imposes penalties only if the contractor "does not meet the proposed percentages" for M/WBE participation. [Dkt. 1-1 at 37.] This indicates that the provision was intended to benefit M/WBE businesses generally, rather than benefitting the specific M/WBEs identified in the Participation Plan. This provision, in other words, advances not **Plaintiff's** interests in obtaining work as a subcontractor, but the **State's** interest in assisting M/WBE enterprises as a whole. The provision therefore is not "in favor of [Plaintiff] and for [Plaintiff's] benefit," *Cain*, 849 N.E.2d at 514, such that it does not support a third-party beneficiary claim.

This conclusion is consistent with this Court's prior decision in *ESG Technical Servs., LLC v. Advantage Health Solutions, Inc.*, No. 1:09-CV-00030-TWP, 2011 WL 2267550 (S.D. Ind. June 6, 2011) (Pratt, J.). The facts of *ESG* are almost identical to the current case: In 2006, the State of Indiana issued a request for services to privatize the management of a healthcare program. *Id.* at *1. Advantage Healthcare ("Advantage") prepared to submit a bid as a general contractor. *Id.* at *2. In doing so, it contacted ESG Technical Services ("ESG"), which had previously been certified as an M/WBE. *Id.* at

*1-2. ESG provided a letter of commitment to Advantage stating that ESG would provide real estate services valued at $500,000 annually for a period of four years. *Id.* at *2.

In 2007, Advantage submitted its bid to the State and included with the bid the letter of commitment from ESG. *Id.* The State selected Advantage's bid, and the resulting contract specifically included ESG in the list of M/WBEs participating in the project. *Id.* The contract also "required Advantage to comply with Indiana Administrative Code provisions that relate to MBEs and WBEs" and "required Advantage to submit any changes to the listed MBEs and WBEs in writing and get written approval from the Indiana Department of Administration ('IDOA')." *Id.* Ultimately, Advantage and ESG never reached an agreement on a subcontract, *id.* at *3, and ESG sued Advantage on the grounds that ESG was a third-party beneficiary to Advantage's contract with the State. *Id.* at *4.

The Court rejected this claim. It concluded that although the State "has a noble goal of encouraging equal opportunity for MBEs and WBEs to participate in the State's award of contracts," this goal "does not automatically establish ESG as a third-party beneficiary." 2011 WL 2267550, at *5. It also noted that ESG's identification in the contract was not dispositive. *Id.* at *5. ("The fact that ESG is mentioned in the contract . . . does not establish an intent to benefit ESG as a third-party beneficiary; rather, naming a party is merely evidence of such an intent.").

The same considerations apply in this case: the State, as described above, has a general interest in assisting M/WBE enterprises, and the contract, as described above, specifically mentions BC*forward*, but these facts do not establish that BC*forward* is a

third-party beneficiary of the PB Contract. As such, these facts do not establish that BC*forward* has any enforceable rights under that contract.

Next, the Court in *ESG* noted that a Court assessing third-party beneficiary status "must view the contract as a whole and 'not from detached provisions thereof.'" 2011 WL 2267550, at *6 (S.D. Ind. June 6, 2011) (quoting *McClain's Estate v. McClain*, 183 N.E.2d 842, 847 (Ind. Ct. App. 1962)). The Court then canvassed the provisions of the relevant contract and concluded that it did not establish ESG as a third-party beneficiary. *Id.* at *5-8. Here, a similar review of the PB Contract "as a whole" indicates that BC*forward* is not a third-party beneficiary.

First, BC*forward* is identified by name only in Section 28 of the contract. That Section does state that Novitex must obtain approval from the State before using different subcontractors, [Dkt. 1-1 at 37], but this provision primarily advances not Plaintiff's interests in obtaining work, but the State's interests in ensuring that its M/WBE goals are achieved. *See ESG*, 2011 WL 2267550, at *6 ("This provision primarily benefits the State in ensuring that Advantage remains in compliance with the MBE/WBE program. ESG benefits from this provision only in the sense that Advantage had to receive State approval to remove ESG from the participation list.").

In addition, Section 28 specifically states that Defendant is subject to penalties only if Defendant "does not meet the proposed percentages in its RFP response, **based on the sole discretion of the Contractor**[.]" [Dkt. 1-1 at 37 (emphasis added).] This language indicates that Novitex retained the freedom to determine how best to meet the State's overall M/WBE goals, such that it was free to deviate from the list of M/WBEs in the contract and/or the amount of work provided to each of the listed M/WBEs. This, in

turn, implies that the contract could **not** have been written with the intent to benefit any specific M/WBEs. If, that is, the contract's drafters specifically wanted to benefit BC*forward* (or any other particular M/WBE), the drafters would not have given the general contractor complete discretion to eschew use of BC*forward* (or any other particular M/WBE). At the very least, the drafters would have given BC*forward* the right to challenge its removal, but no such right appears. [*See* Dkt. 1-1 at 37.] Again, then, the only conclusion is that the contract was designed not to advance any particular M/WBE's business interests, but instead to advance the State's general interest in its M/WBE program. As a result, this section does not establish the intent necessary to create a third-party beneficiary. *See ESG*, 2011 WL 2267550, at *6 ("The provision does not prevent ESG from being removed as a participating MBE, it does not allow ESG to challenge its removal, nor does it prevent Advantage from replacing ESG with other MBEs or WBEs. . . . . This provision, standing alone, does not establish the intent to specifically benefit ESG as a third-party beneficiary.").

Next, Section 1 of the PB Contract incorporates a Statement of Work ("SOW") that sets forth Novitex's duties as general contractor. [Dkt. 1-1 at 24.] Section 1.09 of the SOW states as follows:

> [Novitex] is responsible for the performance management of Subcontractors' obligations that may result from this SOW, consistent with Section 51 of [the PB Contract], and shall work to resolve the non-performance of any subcontractor. [Novitex] is responsible for coordinating billing and payment of its subcontractors. **[Novitex] may modify or terminate Subcontractor agreements at its sole discretion to best meet the performance needs of the Agreement**.

[Dkt. 13-1 at 5 (emphasis added).[7]] As with Section 28, *supra*, this Section indicates that Novitex retained complete discretion to hire or fire subcontractors. If the contract's drafters had intended to benefit a particular M/WBE, those drafters plainly would not have included such a provision; instead, they would have restricted the general contractor's discretion to ensure that the particular M/WBE would benefit from performance of the PB Contract. That the drafters did not include any such restriction is thus strong evidence that they did not intend to benefit BC*forward* or any other particular M/WBE. *See ESG*, 2011 WL 2267550, at *6.

Plaintiff challenges this reading of Section 1.09 on the grounds that it "does not negative the requirements of [Section 28] that BC*forward* would provide services on the project for $85,000." [Dkt. 21 at 15.] As described above, however, Section 28 included its own provision stating that Novitex retained complete discretion to determine how to meet the M/WBE percentage goals. Any "requirement[]" that Novitex use BC*forward* is thus illusory, and Section 28 does not conflict with Section 1.09.

Plaintiff also argues that Section 1.09 merely sets forth that "Novitex, not the State of Indiana, will manage relationships with subcontractors after agreements are

---

[7] The Statement of Work was included with Defendant's motion to dismiss, [*see* Dkt. 13-1], rather than with Plaintiff's complaint. Considering the SOW would thus typically convert Defendant's motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). The SOW, however, was expressly incorporated as part of the PB Contract, [*see* Dkt. 1-1 at 24 (Section 1)], which was itself part of Plaintiff's complaint, and the Court may thus consider the SOW without converting Defendant's motion. *See Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 592 (S.D. Ind. 2000) ("[I]f a document is specifically referenced by the complaint and central to the plaintiff's claim, we may consider that document as part of the pleadings if it is attached to a defendant's motion attacking the sufficiency of the complaint."). This exception to Rule 12(d) is narrow, but it is specifically "aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). The Court thus finds it appropriate to consider the SOW in this case. Moreover, Section 1.09 of the SOW merely confirms the statement in Section 28 of the PB Contract that the general contractor had "sole discretion" to decide how to meet the State's percentage goals. Thus, even if the SOW were excluded, the Court's analysis would not change.

reached." [Dkt. 21 at 15.] This may be true, insofar as this interpretation restates the substance of the first sentence of Section 1.09, but this interpretation ignores the second sentence: that sentence plainly states that Novitex does **not** merely "manage" relationships with subcontractors. To the contrary, Novitex may—at its sole discretion— "modify or terminate" such agreements, such that Novitex has power over the very existence of such agreements. The contract thus leaves it to Novitex to determine how best to meet Indiana's required percentage of M/WBE participation, such that the contract does not evidence a specific intent to benefit BC*forward* itself.

Section 1.09's reference to "Section 51 of [the PB Contract]" does not change this analysis. That Section states in relevant part:

> Contractor will agree to manage State approved Subcontractors listed in RFP response, **subject to such Subcontractors executing a subcontractor agreement with Contractor** containing substantially similar terms and conditions herein. **Should a State authorized Subcontractor fail to execute such agreement with Contractor, Contractor has no obligation to use the Subcontractor for these State Services** and Contractor MWBE commitment related to that specific Subcontractor will be suspended until a qualified replacement subcontractor has been located by Contractor and approved by the State.

[Dkt. 1-1 at 29 (emphasis added).] This Section indicates that mere execution of the PB Contract did not create any enforceable agreement between Novitex and BC*forward*. Only **after** Novitex exercised its "sole discretion," [*see* Dkt. 1-1 at 37 (PB Contract Section 1.08); Dkt. 13-1 at 5 (SOW Section 1.09)], to complete a separate subcontract would Novitex have any "obligation to use the Subcontractor for" the relevant service. [Dkt. 1-1 at 29.] The PB Contract therefore gave **Novitex** the power to decide whether any particular M/WBE would benefit from its agreement with the State, and Section 51's requirement of a separate, later-executed subcontract thus supports the proposition that

the PB Contract itself was not specifically intended to confer a benefit on BC*forward*.

*See ESG*, 2011 WL 2267550, at *7 ("By requiring a legally binding agreement between Advantage and its subcontractors, the contract indicates further steps were necessary before a subcontractor gained any rights against Advantage. Any contractual rights of the subcontractors would derive from being a party to the subcontract and not from being a third-party beneficiary to the State contract.").

BC*forward* attempts to avoid this result by trying to distinguish *ESG* on several grounds. First, Plaintiff argues that the contract at issue in *ESG* contained materially different terms than the contract at issue in this case. [Dkt. 21 at 12-13.] Plaintiff notes that the *ESG* contract required that "'any change to the listed firms found in [the contract] must be submitted to, and approved by, IDOA in writing. A formal amendment process is not required, but formal written approval from IDOA is required for changes in subcontractor participation.'" [Dkt. 21 at 13 (quoting *ESG*, 2011 WL 2267550, at *6).] Plaintiff then asserts 1) that Section 28 of the PB Contract has no such language about written approval, and 2) that Section 28 instead "require[s] Novitex to pay penalties if it unilaterally decides to change it subcontractors." [*Id.*]

Plaintiff's first point does nothing to advance Plaintiff's claim. The fact that the PB Contract has no provision requiring Novitex to obtain written approval from the IDOA indicates that the Novitex has **more** discretion to deviate from the participation plan than did the general contractor in *ESG*. It is thus **less** apparent than in *ESG* that the contract with the State was intended to benefit any particular entity listed in the participation plan. That the Court in *ESG* **still** found that the would-be subcontractor was

not a third-party beneficiary is thus strong evidence that the would-be subcontractor in **this** case is **likewise** not a third-party beneficiary.

Next, Plaintiff's second point badly misreads Section 28. That Section states only that the State may impose penalties on Defendant if Defendant "does not meet the proposed percentages in its RFP response[.]" [Dkt. 1-1 at 37.] It does **not** say that the State will impose penalties if Novitex simply changes the contractors it uses to meet those percentages. [*See id.*] The provision thus protects the State's interest in achieving the overall percentages, and so any argument that the penalties are designed to protect specific contractors' interests ignores the actual text of the provision.

Plaintiff then contends that the contract at issue in *ESG* "contained a list of requirements for subcontracts that are not present in the [PB Contract], including: (1) executing a legally binding agreement in writing, (2) that specifies the functions of the subcontractor, (3) includes the amount, duration, and scope of services to be provided in the subcontract, and (4) includes provisions for revoking the subcontract or imposing sanctions for poor performance." [Dkt. 21 at 13 (citing *ESG*, 2011 WL 2267550, at *7).]

Plaintiff's argument is unavailing. As an initial matter, the PB Contract **does** contain many of these terms: Section 51 of the PB Contract states that Novitex's duties to manage the subcontractors were "subject to such Subcontractors executing a subcontract agreement with Contractor containing substantially similar terms and conditions herein," [Dkt. 1-1 at 52], and Section 1.09 of the SOW gave Novitex to power to "modify or terminate Subcontractor agreements." [Dkt. 13-1 at 5.] Just as in *ESG*, then, the agreement in this case plainly contemplated that the contractor and subcontractors would

enter separate, legally binding agreements that provided for performance of certain functions and allowed for revocation of the agreements.

Next, the Court in *ESG* found the above provisions relevant because they indicated that "the parties did not intend to bestow third-party benefits on any of the subcontractors at the time of the contract's execution." 2011 WL 2267550, at *7. Here, Section 51 of the PB Contract and Section 1.09 of the SOW stand for the same proposition. These sections indicate that, after winning the bid for RFP 7-61, Novitex was to complete separate agreements with each subcontractor, such that any rights of these subcontractors—just as in *ESG*—"would derive from being a party to the subcontract and not from being a third-party beneficiary to the State contract." 2011 WL 2267550, at *7. Thus, even if the subcontract provisions in this case are not identical to those in the *ESG* contract, the substance of the provisions is the same, and the Court finds persuasive *ESG*'s reasoning that such provisions are inconsistent with an intent to confer any specific benefits through the PB Contract itself.

Plaintiff finally attempts to distinguish *ESG* on the grounds that *ESG* was decided on summary judgment, rather than on a motion to dismiss. [Dkt. 21 at 11, 16.] Plaintiff notes that the Court in *ESG* referred to deposition testimony during its analysis of the intent to confer third-party beneficiary status, and Plaintiff thus argues that the Court in this case must likewise allow discovery to proceed to determine whether Plaintiff was in fact a third-party beneficiary. [*Id.* at 16.]

Plaintiff's argument exaggerates the weight placed on the deposition testimony. When analyzing the parties' intent, the Court in *ESG* noted that the State's representative had testified that "it is not uncommon that a prime contractor and a particular MBE or

WBE are unable 'to truly come to terms,'" either because "the MBE or WBE is at fault, or the prime contractor has business reasons for not going through with a deal." 2011 WL 2267550, at *7. The Court thus referred to the deposition testimony only to explain why a contractor and subcontractor might sometimes fail to execute a subcontract.

This explanation, however, is not necessary to the third-party beneficiary inquiry. The deposition testimony may have explained **why** a subcontractor might not execute a subcontract, but this issue has little bearing on **whether** the subcontractor was a third-party beneficiary in the first place. The latter inquiry depends on whether the contracting parties had the intent to confer a specific benefit on the third-party, and this intent must appear from the language of the contract itself. *Cain*, 849 N.E.2d at 514. Events occurring **after** the contract had already been executed thus shed little light on whether the contracting parties actually had the required intent to benefit the third party at the time they drafted the contract. As a result, the reference to the deposition testimony in *ESG* was unnecessary to decide whether the first element of the third-party beneficiary test had been satisfied, such that the Court in this case need not allow Plaintiff to conduct similar discovery before concluding that Plaintiff was not such a beneficiary.[8]

Moreover, Indiana courts have repeatedly stated that contract interpretation is a matter of law for the courts to decide. *See, e.g.*, *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) ("Interpretation of a contract is a pure question of law[.]"); *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002) ("[C]onstruction of the terms of a

---

[8] Plaintiff also briefly notes that, in *ESG*, the State split the relevant contract between two prime contractors. [Dkt. 21 at 12.] This, in turn, reduced the amount of services that Advantage required from ESG, which ultimately led to the failure to execute a subcontract. [*Id.*] Plaintiff notes that no such circumstances are present in this case, but again, this observation has little relevance. Such intervening events may explain **why** a subcontract never materialized, but they do not indicate **whether** the contracting parties intended to bestow a benefit on the third party before those events occurred.

written contract is a pure question of law for the court[.]") This remains true "even if the [contract] contains an ambiguity needing resolution." *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). A reviewing court thus turns to extrinsic evidence only if the court finds that it is incapable of resolving the ambiguity without such evidence. *Id.*

Here, the PB Contract presents no such ambiguity: Section 28 of the contract states that Novitex had "sole discretion" to determine how to meet the State's M/WBE goals, and the other sections discussed above merely reinforce the conclusion that the contract meant what it said. Novitex was not obligated to use BC*forward* in fulfilling the PB Contract, and the parties thus did not intend to benefit BC*forward* in executing the contract. As such, BC*forward* is not a third-party beneficiary, and the Court need not wait for Plaintiff to conduct discovery before reaching this conclusion.

## 2. Duty Imposed in Favor of Third Party

The second element of the third-party beneficiary inquiry requires a "duty imposed on one of the contracting parties in favor of the third party." *Luhnow*, 760 N.E.2d at 628. To establish this element, Plaintiff relies on the IDOA Policy, [Dkt. 21 at 17], which provides in part:

> Contractors shall contract with all MBE and WBE firms listed on the Participation Plan. The subcontract or purchase order shall be for an amount that is equal to, or greater than, the total amount listed on the form.
> . . .
> The Contractor's proposed MBE and WBE Contract Goals will become incorporated into and a requirement of the Contract. Contracts shall not substitute, replace or terminate any MBE and WBE firm without prior written authorization from MWBED and the Owner.

[Dkt. 1-1 at 19.] Plaintiff emphasizes the mandatory language ("shall contract") and asserts that the IDOA Policy thus imposed a duty on Novitex to contract with BC*forward* and thereby confer a benefit on BC*forward*. [Dkt. 21 at 17.]

This argument suffers from two flaws. First, the PB Contract contains a merger clause stating that "[n]o understandings, agreements, or representations, oral or written, not specified within this Contract will be valid provisions of this Contract." [Dkt. 1-1 at 37.] Certain sections of the Contract specifically incorporate other agreements, [*see id.* at 24 (incorporating SOW)], but Plaintiff has not pointed to any contractual language that incorporates the IDOA Policy as part of the PB Contract.[9]

In addition, even if the policy were part of the PB Contract, the PB Contract also contains an Order of Precedence Clause. [Dkt. 1-1 at 39.] This provision states that in the event of any inconsistency or ambiguity, the language of the contract itself is controlling over any attachments prepared by either party to the contract. [*Id.*] Hence, even if the mandatory language of the IDOA Policy **had** been incorporated into the contract, the permissive language giving Novitex "sole discretion" to determine how to meet Indiana's M/WBE percentage goals would trump the IDOA Policy language. [*See* Dkt. 1-1 at 37 (Section 28 of PB Contract) ("If the Contractor does not meet the proposed percentages in its RFP response, based on the sole discretion of the Contractor, the Contractor could be subject to payments being withheld[.]").]

The second problem with Plaintiff's argument is that even if the IDOA Policy were considered a binding contractual provision, any duty imposed by the IDOA Policy was not imposed "in favor of the third party." *Luhnow*, 760 N.E.2d at 628. The IDOA Policy outlines Indiana's general goals for increasing M/WBE participation in State projects. [*See* Dkt. 1-1 at 16 ("The 2010-2011 Contract Goals for construction projects

---

[9] Indeed, Plaintiff seems to implicitly accept that the IDOA Policy was **not** part of the contract. [*Compare* Dkt. 21 at 13 (Plaintiff's Resp.) (arguing that PB Contract has no language requiring "formal written approval from IDOA . . . for changes in subcontractor participation"), *with* Dkt. 1-1 at 19 (IDOA Policy) ("Contracts shall not substitute, replace or terminate any MBE and WBE firm without prior written authorization from MWBED and the Owner.").]

are 7% for MBE's and 5% for WBE's".).] The IDOA Policy does **not** state that it seeks to benefit any **particular** MBE or WBE. [*See id.* at 15-22.] Thus, when the IDOA Policy indicates that a general contractor "shall contract" with identified subcontractors, the Policy advances **Indiana's** goals by ensuring that M/WBEs do in fact receive work. Any duty that the IDOA Policy imposed on Novitex was thus owed to the **State** rather than to BC*forward*.

Indeed, this Court previously endorsed similar reasoning in *ESG*. There, ESG argued that "the State expects Contractors to make good faith efforts to follow through on entering contracts with M/WBEs listed in their participation plan, and to fulfill the commitments made during the procurement process." 2011 WL 2267550, at *8. The Court, however, found that if any such duty existed, that duty ran to the State, as the ultimate goal of any such duty was to ensure compliance with the State's overall percentage goals. *See id.* (Pratt, J.) ("If a duty of good faith does exist in the contract, the Court finds that the duty was not in favor of ESG because Advantage could satisfy the good faith duty by including other MBEs or WBEs, so long as there was a similar dollar amount or percent of the contract committed.") Ultimately, then, any duty to execute a subcontract that Novitex may have had in this case was not a duty imposed in favor of BC*forward*, and that duty therefore cannot support BC*forward*'s third-party claim.

This conclusion is also consistent with *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743 (7th Cir. 1999); *see also ESG*, 2011 WL 2267550, at *5 (citing *Wiley, supra*). There, minority-owned contractors brought a § 1983 claim against Indiana officials on the grounds that Indiana had failed to fulfill its obligations under federal law to hire a certain percentage of disadvantaged business enterprises. *Id.* at 746.

The federal statutes at issue were the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA") and the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), which together required Indiana to expend at least 10% of its highway funding through small businesses owned by socially and economically disadvantaged individuals. *Id.*

To assess whether the individual plaintiffs had a right to enforce these statutes, the Seventh Circuit asked "whether Congress intended, in [the] particular statutory provision[s], to benefit the individual[s] seeking enforcement of the alleged federal right." *Wiley*, 187 F.3d at 750. The court concluded that the statutes did not evidence such intent. Although the statutes and their associated regulations contained numerous details regarding the provision of work, these details focused "on what the states must do, in structuring their programs, to maximize the opportunity of minority businesses to participate in contracts financed with federal funds." *Id.* at 751. The statutes did **not** "guarantee that any one disadvantaged group [would] receive any contracts, let alone that any individual in any group [would] receive a contract or any other individual benefit." *Id.* The Court thus concluded that, even if the STURAA and the ISTEA might "ultimately benefit individuals," the statutes themselves were merely a general guide for what the states must do to comply with the federal program. *See id.* As such, the individual plaintiffs failed to show that they themselves were entitled to enforce the statutory scheme against the State. *Id.*

The same analysis applies here: The IDOA Policy sets out numerous requirements for the provision of work to M/BWEs, but these details focus "on what the [general contractors] must do, in structuring their programs, to maximize the opportunity of

minority businesses to participate in contracts financed [by the State.]" *Wiley*, 187 F.3d at 751. The IDOA Policy thus sets out a general goal of achieving 7% participation for MBEs and 5% participation for WBEs, [Dkt. 1-1 at 16], but it contains no indication that any particular MBE or WBE is to be used in meeting these goals. Hence, even if the IDOA Policy may "ultimately benefit individuals," any such benefit is merely incidental to the general contractors' compliance with the policy. The general contractors, that is, have a duty to the **State** to advance the **State's** interest in achieving its 7% and 5% participation goals, but the contractors have no duty to any **individual** M/WBE. Any duty imposed by the IDOA Policy is thus in favor of the State, rather than a third party, and that duty cannot support a third-party breach of contract claim. *See Luhnow*, 760 N.E.2d at 628 (emphasis added) (relevant duty must be "imposed on one of the contracting parties **in favor of the third party**").

    Plaintiff contests this conclusion on the grounds that *Wiley* is distinguishable from the current case. Plaintiff first notes that *Wiley* involved a federal regulatory scheme and a § 1983 claim, rather than a state regulatory scheme and a breach of contract claim. [Dkt. 21 at 10.] Plaintiff, however, does not explain why this alters the analysis. [*See id.*] The Seventh Circuit in *Wiley* answered the same question as is relevant here: did one party clearly demonstrate its intent to confer a benefit on a particular third party? *Compare Wiley*, 187 F.3d at 750 (asking whether Congress "intended that the provision in question benefit the plaintiff"), *with Luhnow*, 760 N.E.2d at 628 (asking whether the contract showed "clear intent by the actual parties to the contract to benefit the third party"). The relevant legal question is the same, and Plaintiff has identified no reason

why the source of the alleged right (legislature or contract) or the label attached to the cause of action (breach of contract or § 1983) should affect the answer to that question.

Next, Plaintiff notes that the individual firms in *Wiley* were not specifically identified by name in the relevant contracts or the regulatory scheme. [Dkt. 21 at 10.] As described above, however, identification by name is not the *sine qua non* of third-party beneficiary status, and the fact that Plaintiff in this case **was** named in the PB Contract does not establish that it has a third-party contract claim. Moreover, the IDOA Policy—just like the regulatory scheme in *Wiley*—contains no mention of Plaintiff or any other particular M/WBE. The IDOA Policy is thus analogous to the statutes and regulations at issue in *Wiley*, such that if the policies in *Wiley* did not demonstrate any intent to benefit a particular contractor, the policy at issue in this case likewise fails to demonstrate any such intent.

Plaintiff then notes that the *Wiley* court was reviewing a district court's disposal of the case on summary judgment, rather than on a motion to dismiss. [Dkt. 21 at 10.] The court in *Wiley*, however, evaluated the STURAA and ISTEA claims purely by interpreting the language of the statutory and regulatory scheme. *See* 187 F.3d at 750-52. The court did not rely on any designated evidence or other information revealed through discovery, and the Court in this case likewise need not wait for Plaintiff to conduct discovery. As such, Plaintiff's attempts to distinguish *Wiley* are unpersuasive, and the Court may follow *Wiley's* reasoning in determining that Plaintiff has not supported its claim that the IDOA Policy or the PB Contract imposed a duty in its favor.

Finally, Plaintiff alleges that, as recently as October 7, 2014, "Indiana's public project bidding and payment system reflect[ed] that BC*forward* is listed as an MBE/WBE

subcontractor" for the PB Contract. [Dkt. 1-1 ¶ 31; *see also* Dkt. 21 at 19.] Plaintiff sees

this as evidence that Novitex breached the contractual provision requiring it to obtain

approval from the State before changing its participation plan, [*see* Dkt. 1-1 at 37], but

Plaintiff's own exhibits contradict this allegation: Amendment No. 17, attached as

Plaintiff's Exhibit 4, [Dkt. 1-1 at 55], was signed by representatives from the IDOA, the

Indiana State Budget Agency, and the Indiana Office of the Attorney General. [*Id.* at 57.]

That Amendment removed Section 28's specific references to BC*forward* and other

M/WBEs, and it acknowledged that the amount of services purchased from each

subcontractor would "vary through the terms of the contract." [*Id.* at 55.] The

Amendment thus indicates that, even if the public bidding system does not yet reflect the

change, the State **did** approve of any changes to Section 28 and the State **did** approve of

the removal of the contract's specific reference to BC*forward*.

 Moreover, even if Novitex **did** breach its duty to obtain approval, Plaintiff has not

explained how such a breach is relevant to Plaintiff's status as a third-party beneficiary.

To establish such a status, Plaintiff must show that the PB Contract imposed a duty in its

favor, but as this Court has previously explained, "the duty to inform IDOA of any

changes to the listed MBEs or WBEs" is a duty "**owed to the State**." *ESG*, 2011 WL

2267550, at *8 (emphasis added). Thus, even if the duty to obtain approval had been

breached, this breach would not be a basis for Plaintiff's third-party beneficiary claim.

 For all these reasons, the Court concludes both that the PB Contract did not

clearly evidence the intent to benefit Plaintiff and that the PB Contract did not impose a

duty on Novitex in favor of Plaintiff. As a result, Plaintiff has failed to plead facts

establishing the essential elements of its third-party contract claim. Further, the

deficiency in Plaintiff's complaint lies not merely in the level of detail or specificity in Plaintiff's pleading, but in the substance of the contractual provisions that allegedly support Plaintiff's claims. The contract and Plaintiff's other exhibits, that is, affirmatively show that Plaintiff is not entitled to the relief it seeks, such that allowing Plaintiff to amend its third-party contract claim would be futile. The Magistrate Judge accordingly recommends that Plaintiff's third-party contract claim be dismissed with prejudice.

### III.  Conclusion

For the reasons set forth above, the Magistrate Judge recommends that the Court **GRANT** Defendant's Motion to Dismiss, [Dkt. 12], and dismiss the entirety of Plaintiff's complaint with prejudice. Any objections to the Magistrate Judge's recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  05/22/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

David O. Tittle
BINGHAM GREENEBAUM DOLL LLP
dtittle@bgdlegal.com

Gregory A. Neibarger
BINGHAM GREENEBAUM DOLL LLP
gneibarger@bgdlegal.com

David J. Bodle
HACKMAN HULETT LLP
dbodle@hhlaw-in.com

Anthony Seaton Ridolfo, Jr.
HACKMAN HULETT LLP
aridolfo@hhlaw-in.com